# Illinois Official Reports

## Appellate Court

---

### *People v. Reveles-Cordova*, 2019 IL App (3d) 160418

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEJANDRO REVELES-CORDOVA, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0418 |
| Filed<br>Modified upon<br>denial of rehearing | January 17, 2019<br><br>March 27, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 10-CF-2429; the Hon. Sarah F. Jones, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Brian W. Carroll, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Mark A. Austill, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justices Carter and O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury found defendant, Alejandro Reveles-Cordova, guilty of criminal sexual assault and home invasion. 720 ILCS 5/12-11(a)(6), 12-13(a)(1) (West 2010). On direct appeal, defendant argues this court should reverse his convictions, remand for further proceedings, or modify his convictions because (1) the trial court committed plain error by failing to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), where the evidence was closely balanced, (2) trial counsel denied defendant effective assistance of counsel, (3) the trial court did not adequately address defendant's *pro se* claims of ineffective assistance as required by *People v. Krankel*, 102 Ill. 2d 181 (1984), and (4) defendant's conviction for criminal sexual assault should be vacated under the one-act, one-crime rule. We affirm in part, reverse in part, and remand.

¶ 2                                        BACKGROUND

¶ 3    On November 22, 2010, the State charged defendant with home invasion (720 ILCS 5/12-11(a)(6) (West 2010)), criminal sexual assault (*id.* § 12-13(a)(1)), aggravated domestic battery (*id.* § 12-3.3(a-5)), and violation of an order of protection (*id.* § 12-30(a)(1)). The charging instrument alleged defendant committed these acts against his former girlfriend and mother of his children, J.B., on November 20, 2010.

¶ 4    In July 2012, the State tried defendant for the first time. Defendant took the stand in his defense. The jury found defendant guilty on all four counts. Defendant appealed that conviction. This court reversed and remanded for a new trial, finding defendant received ineffective assistance of counsel. *People v. Reveles-Cordova*, 2014 IL App (3d) 120887-U, ¶ 38.

¶ 5    In February 2016, the State retried defendant. In opening statements, defense counsel told the jury "[t]he issue in this case is going to be consent." He also told the jury that the State has the burden of proof; the defendant is presumed innocent. He informed the jury:

        "I don't have to present any evidence. I may do so. I may not. Either way, please wait until I have had a chance to make my closing argument."

He assured the jury that the State could not meet their burden in proving defendant guilty beyond a reasonable doubt.

¶ 6                                I. The State's Case-in-Chief

¶ 7    The State called J.B. as its first witness. J.B. testified she had a 15-year relationship with defendant. J.B. and defendant ended their romantic relationship in January 2010. J.B. remained in the Grassy Knolls house the two shared with their children. J.B. obtained an order of protection against defendant in October 2010 that was to remain effective until May 2011. The order of protection covered their formerly shared residence.

¶ 8    On November 20, 2010, J.B. was home alone getting ready for a date with Ben Marshall. She testified she locked the door to her bedroom and took a shower. While drying off, J.B. heard someone coming up the stairs. She heard the person trying to open the door. Defendant kicked open the door. He began rummaging through the room as if he was looking for something.

¶ 9 J.B. repeatedly told defendant to leave because of the order of protection. Defendant grabbed and pushed her. He took her phone when she received a text message. Defendant asked J.B. who Marshall was. J.B. said defendant called Marshall and said, "I'm going to kill you, motherfucker." J.B.'s phone records do not show a call was placed to Marshall in the time frame J.B. described.

¶ 10 Defendant took a vase of roses Marshall bought for J.B. and threw them on the floor. He pushed J.B. onto an ottoman. There was conflicting evidence as to whether she was on her back or her stomach. Defendant pulled a tampon out of J.B.'s vagina and penetrated her with his penis. J.B. did not consent to having intercourse with defendant. Defendant finished and began choking J.B. She tried to push defendant away. J.B. testified she felt her body becoming "weak and warm." She said things were "going dark." J.B. lost her breath and stopped fighting back. J.B.'s cell phone began to ring; defendant released his hands from around her neck. J.B.'s neighbor called. J.B. told defendant her neighbor knew to call if she saw defendant's truck at J.B.'s house because of the order of protection. Defendant became nervous and left.

¶ 11 J.B. got dressed and called Marshall. Marshall told her to call the police. J.B. called 911. The audio recording of this call was played for the jury. J.B. can be heard coughing and crying throughout the call. She is unintelligible at points as she tried to speak in between sobs. J.B. told the 911 dispatcher that she was calling because her ex-boyfriend broke into her house. J.B. said she did not need an ambulance; she was calling to make a report that he raped her. In response to the dispatcher's questions regarding the rape allegation, J.B. stated, "he didn't touch me physically, like punch me or anything." The dispatcher asked if J.B. was coughing because she was strangled. J.B. responded that defendant tried grabbing her by the neck but she could also be coughing because she was scared. After the State played the call, J.B. said she did not initially say defendant choked her because she was confused and nervous. J.B. went to the hospital; she submitted to a rape kit.

¶ 12 The State called Marshall to the stand. Marshall testified he received a call from J.B.'s cell phone on the night of November 20, 2010. A man called and said he was going to kill Marshall. He said he could hear J.B. in the background screaming "leave me alone." Marshall testified J.B. called him back to explain what defendant had done. She sounded "very fearful, very afraid." He told her to call the police.

¶ 13 Romeoville police officer Christopher Swiatek testified he responded to J.B.'s 911 call. He described her as crying and shaking. He did not observe any visible injuries. He noted the vase on the floor of the bedroom, as well as a bloody tampon by the bed. Swiatek testified that J.B. said her ex-boyfriend assaulted her. She did not mention being strangled.

¶ 14 Romeoville police officer Brandon Helton testified that he took photographs of the Grassy Knolls home. He said a first-floor window was unsecured; someone could have come in and out of that window. He said the door to the master bedroom appeared to have been forced open. He noted the door frame seemed to be dislodged. Helton saw paint chips on the floor surrounding the door. Helton took pictures of the vase, tampon, and flowers strewn on the floor. He observed the master bedroom was disheveled but the rest of the house was neat and orderly.

¶ 15 Romeoville detective Kelley Henson testified he met J.B. at the hospital on November 20, 2010, to discuss her claims of sexual assault. He said J.B. looked like she had been crying. He did not notice any markings on J.B. J.B. never told him that defendant struck her.

¶ 16    Firefighter paramedic William O'Connor testified that he treated J.B. on the night of November 20, 2010. He said J.B. reported being raped and choked but denied sustaining any injuries. O'Connor examined J.B.'s neck. He reported no signs of injuries. He testified it is not uncommon for victims of choking to show no injuries.

¶ 17    The parties stipulated that J.B. completed a sexual assault kit. The attending doctor found no injuries to J.B.'s vagina, vulva, or cervix. A lab technician identified defendant's deoxyribonucleic acid (DNA) from samples taken from J.B.'s vagina. The parties stipulated forensic reports showed defendant's fingerprints on the vase and J.B.'s phone.

¶ 18                        II. Defendant's Case-in-Chief

¶ 19    Defendant called only Alejandro Jr. to testify. He is defendant and J.B.'s eldest son. He testified that, to his knowledge, defendant had a key to the Grassy Knolls residence. He could not remember if J.B. changed the locks in 2010 following the order of protection. Alejandro Jr. testified that he often lost his key. J.B. left a window unlocked so that he could climb in and out. The family knew the window was unsecured.

¶ 20    Alejandro Jr. testified that the lock on J.B.'s door was not working; someone could push hard and open it. Alejandro Jr. found an envelope filled with cash sometime around November 2010. He did not know exactly how much was in the envelope. On November 20, 2010, defendant called Alejandro Jr. At this point, Alejandro Jr. had not heard from J.B. Defendant told him to tell J.B. not to press charges against him because she was lying. Alejandro Jr. described J.B. as having trouble getting the words out when she told him what happened on November 20.

¶ 21    Ultimately, defendant decided not to testify. Defense counsel sought a ruling on whether the State could impeach defendant with testimony regarding the money. During the first trial, defendant did not testify regarding the money Alejandro Jr. found. At this trial, defendant was going to maintain he went to the Grassy Knolls residence that night to get the money. Counsel argued defendant's lack of testimony regarding the money should not be available for impeachment purposes because it was part of first trial counsel's strategy to leave it out. Counsel also expressed concern about calling the first trial counsel as a witness. Counsel said he did not raise the issue in a motion *in limine* because he did not think the State could impeach defendant with the money testimony. He also said he had not decided whether to elicit testimony regarding the money before the start of trial. The State responded that it never received discovery concerning the money. This indicated defendant created the story to foster his claim that he and J.B. engaged in consensual intercourse after he innocently stopped by to retrieve the money. The court ruled the State would be allowed to impeach defendant with his prior testimony if he chose to take the stand. However, defendant would be able to testify to conversations with first trial counsel to make the claim that she advised defendant against discussing the money in the first trial. His waiver of his attorney-client privilege would be for the limited purpose of trial strategy regarding the money. First trial counsel was not permitted to testify. Defendant had the option to call an investigator who could testify that the money was not a recent fabrication.

¶ 22    Trial counsel informed the court that defendant would not take the stand due to concerns of possible impeachment. Defendant responded "yes" when the trial court asked if counsel informed him of his right to testify or remain silent. Defendant also responded affirmatively when the trial court asked defendant if he realized the decision was his and his alone.

- 4 -

¶ 23    During discussions for jury instructions, the trial court informed defense counsel that the jury would not receive an instruction regarding consent unless defendant testified as to consent. Because defendant chose not to testify, the jury would not be instructed on the issue. The court cautioned counsel not to introduce the idea of consent in closing arguments. Defendant was present for this discussion.

¶ 24    In closing arguments, counsel for defendant conceded that defendant did have sex with J.B. He urged the jury to find the State did not prove beyond a reasonable doubt that defendant threatened or used force to have sex with J.B. Counsel highlighted J.B.'s inconsistencies and maintained she was not credible.

¶ 25    The jury found defendant guilty of sexual criminal assault and home invasion. The jury found defendant not guilty of aggravated domestic battery.

¶ 26    Defendant filed two posttrial motions. One motion argued the court erred in allowing the State to impeach defendant with his prior testimony that did not mention the money found at the Grassy Knolls residence. The other motion argued the one-act, one-crime rule defendant raises on appeal. The court denied both motions.

¶ 27    Defendant filed a *pro se* motion alleging trial counsel provided ineffective assistance. He argued trial counsel did not give him the option to have a bench trial. Defendant framed his motion in terms of *Strickland v. Washington*, 466 U.S. 668 (1984). At the *Krankel* hearing, the court questioned him regarding his claims of ineffective assistance as well as the *Strickland* standard. The court denied defendant's motion.

¶ 28    At sentencing, defendant attempted to raise additional claims of ineffective assistance. The trial court refused to hear defendant's claims. The trial court sentenced defendant to 11 years' imprisonment on the home invasion count and 9 years' imprisonment on the criminal sexual assault count, to run consecutively.

¶ 29    This appeal followed.

ANALYSIS

¶ 30

¶ 31    On appeal, defendant argues (1) we should remand for a new trial where the trial court committed plain error in failing to comply with Rule 431(b), (2) trial counsel provided ineffective assistance, (3) the trial court conducted an inadequate inquiry under *Krankel*, and (4) his convictions should merge under the one-act, one-crime rule.

I. Illinois Supreme Court Rule 431(b)

¶ 32

¶ 33    Rule 431(b) requires the trial court to inquire whether each potential jury member both understands and accepts four principles referred to as the *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); see *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). The jury must acknowledge that the defendant is presumed innocent, the State is required to prove guilt beyond a reasonable doubt, the defendant is not required to put on a case, and the jury cannot hold defendant's decision not to testify against him or her. See Ill. S. Ct. R. 431(b) (eff. July 1, 2012); *Zehr*, 103 Ill. 2d at 477 (1984).

¶ 34    Defendant argues, and the State concedes, that the trial court erred in failing to properly instruct the jury regarding the *Zehr* principles. The trial court did not question the jury for the principle that a defendant's lack of testimony could not be held against him. It also asked the jury whether it disagreed with the principle that the defendant is not required to put on

evidence. The court did not affirm that the jury understood and accepted this principle. Although defendant did not preserve this issue in a posttrial motion, he argues this court should analyze the issue under the plain-error doctrine.

¶ 35 The plain-error doctrine provides a means for appellate review where defendant would have otherwise forfeited his right to appeal of an issue. Ill. S. Ct. R. 651(a) (eff. July 1, 2017). Plain-error review is appropriate in two circumstances. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant urges this court to find plain error where "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Id.* The State concedes error occurred. The next inquiry is whether the evidence was so closely balanced that the trial court's failure to properly inquire of the *Zehr* principles prejudiced defendant's right to a fair trial.

¶ 36 Plain-error analysis under the claim that the evidence was closely balanced is similar to analysis used in evaluating claims of ineffective assistance. *People v. Herron*, 215 Ill. 2d 167, 178 (2005). Defendant must show prejudice, meaning "the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.*, that the verdict 'may have resulted from the error and not the evidence' properly adduced at trial." *People v. White*, 2011 IL 109689, ¶ 133 (quoting *Herron*, 215 Ill. 2d at 178).

¶ 37 We do not find the evidence was closely balanced after reviewing the record. The State's case was replete with evidence that defendant committed both home invasion and criminal sexual assault. Multiple witnesses testified that J.B. was upset and verbalized that her ex-boyfriend assaulted her. From Marshall, the first person she spoke with, to the staff at the hospital, J.B. consistently said defendant penetrated her without consent. The conflicting evidence as to whether defendant strangled J.B. does not negate other evidence of force. Criminal sexual assault requires "force or [the] threat of force." 720 ILCS 5/12-13(a)(1) (West 2010). J.B. testified that she asked defendant to leave immediately upon realizing he was in the house. J.B. struggled with defendant as he ransacked the bedroom. Defendant threw a vase of flowers onto the ground. Defendant pushed J.B. down onto the ottoman, removed her tampon, and inserted his penis into her vagina despite her protests. The police photographs corroborate J.B.'s version of events by documenting the vase, tampon, and flowers on the floor. Marshall testified that he could hear J.B. on the phone yelling "leave me alone." J.B. had an active order of protection against defendant that extended to the Grassy Knolls home. The 911 recording of J.B.'s call indicated she was upset to the point of crying and coughing. She accused defendant of rape in the call. Each piece of evidence indicated to the jury that defendant forced himself upon J.B.

¶ 38 Defendant argues J.B.'s testimony is suspect due to inconsistencies, as well as a lack of physical injury. Because credibility of witnesses is an issue left to the jury, and the trial court improperly questioned the jury under Rule 431(b), defendant argues this means the trial court's error changed the outcome of the trial. We do not agree.

¶ 39 Defense counsel told the jury that defendant did not have to put on a case at all; the State had the burden of proof that the defendant was not required to rebut. Although these statements do not cure the error, it does show the jury was informed of the principles. Failure to comply with Rule 431(b) does not automatically require remand for a new trial. *People v. Thompson*, 238 Ill. 2d 598, 608-16 (2010). Defendant must still show the evidence was closely balanced. Defendant states in his brief that he intended to testify J.B. consented to having sex with him;

he was only in the house to retrieve the money he hid there. J.B. never omitted or denied her allegation that defendant nonconsensually penetrated her. Defendant, after leaving the Grassy Knolls home but before being picked up by police, called Alejandro Jr. He requested his son ask his mother not to press charges. He insisted she was lying. Alejandro Jr. had not heard from his mother at this point. He had no idea what she claimed happened. Alejandro Jr.'s testimony indicated to the jury that defendant knew what he had done; he did not think J.B. consented to having sex with him. He was covering his tracks immediately after leaving the home. Defendant cannot show that the trial court's error prejudiced him; his sole witness's testimony did the most damage in independently corroborating J.B.'s version of events. See *People v. McCovins*, 2011 IL App (1st) 081805-B, ¶ 39 (finding the evidence against the defendant was not closely balanced even where he impeached witnesses, presented alibis, and argued dark conditions could not permit accurate identification).

¶ 40    We do not find the evidence was so closely balanced that the trial court's error in instructing the jury regarding Rule 431(b) constituted plain error.

¶ 41                          II. Ineffective Assistance of Counsel

¶ 42    Defendant argues trial counsel denied him effective assistance. Specifically, defendant maintains trial counsel erred by (1) not seeking a ruling on the State's ability to impeach defendant regarding the money prior to opening statements and (2) abandoning the consent defense after obtaining an adverse ruling.

¶ 43    A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amend. VI. Claims alleging ineffective assistance of counsel are governed by *Strickland*. *Strickland*, 466 U.S. 668. The Illinois Supreme Court adopted *Strickland* in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To show ineffective assistance, a defendant must show "counsel's representation fell below an objective standard of reasonableness and that counsel's shortcomings were so serious as to 'deprive the defendant of a fair trial.' " *Id.* at 525 (quoting *Strickland*, 466 U.S. at 687). "[A] defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Coleman*, 2015 IL App (4th) 131045, ¶ 80 (quoting *Strickland*, 466 U.S. at 694). We review claims of ineffective assistance *de novo*. *Id.* ¶ 66.

¶ 44                          A. Motion on the State's Ability to Impeach Defendant

¶ 45    Defendant claims trial counsel told the jury he would be presenting a consent defense and then abandoned such defense, amounting to *per se* ineffective assistance. See *People v. Patterson*, 192 Ill. 2d 93, 120-21 (2000). This claim is not borne out by the record. Trial counsel told the jury the issue in the case would be consent, in that the State would not be able to prove beyond a reasonable doubt that defendant used force to have sex with J.B. and did not receive consent. He never claimed he would be presenting a case demonstrating J.B. consented to intercourse. In fact, he explicitly told the jury he might not present a case at all, as it was within defendant's rights to present no evidence and let the State's case speak for itself. The claim that trial counsel abandoned a promised defense is belied by the record.

- 7 -

¶ 46        Defendant also argues trial counsel should have obtained a ruling on the State's ability to impeach defendant before opening statements. Our finding that defense counsel did not promise a consent defense in opening statements disposes of this argument as well.

¶ 47                            B. Abandoning the Consent Defense

¶ 48        In his petition for rehearing, defendant argues that this court misapprehended the second part of his allegation of ineffective assistance. Defendant maintains trial counsel denied him effective assistance of counsel by abandoning the consent defense after obtaining an adverse ruling.

¶ 49        Defendant claims that trial counsel's decision to abandon the consent defense was objectively unreasonable for several reasons. First, any threat of impeachment would have been neutralized had the first trial counsel's investigator testified that the omission of the money at defendant's first trial was a strategic decision—not a recent fabrication. Second, trial counsel was wrong to be concerned about attorney-client disclosures because the trial court limited the disclosure to a discussion of the money. Finally, defendant contended he always wanted to testify, he said so during the hearing on his *pro se* posttrial motion, and his explanation would have further discredited J.B.'s testimony. Essentially, defendant argues he wanted to testify and could have done so without damaging his position at trial.

¶ 50        Defendant maintains he should have taken the stand, regardless of the adverse ruling, because he would have provided some evidence of consent. In his first trial, defendant took the stand to offer his testimony that J.B. consented to sex. Notably, the jury there also convicted defendant of aggravated domestic battery. Clearly, defendant's decision to testify did not work in his favor at the first trial. After reading the record, it appears the jury did not find defendant guilty of aggravated domestic battery in this trial because J.B. reported the strangling inconsistently.

¶ 51        The defendant retains authority over the decision of whether to testify. *Rock v. Arkansas*, 483 U.S. 44, 53 (1987). Defendant made the choice not to testify. The record shows the court asked him questions regarding this right and the information trial counsel gave him about the right to testify. Defendant at all times affirmed that he knowingly waived the right to testify. Trial counsel could not have supported a consent defense without defendant's testimony. The court informed counsel, in front of defendant, that the jury would not be instructed on consent unless defendant took the stand.

¶ 52        In arguing that counsel provided an objectively unreasonable performance in abandoning the consent defense, defendant cites *People v. Bryant*, 391 Ill. App. 3d 228, 241 (2009). *Bryant* is instructive in whether counsel acts unreasonably in promising and then failing to deliver a defense, an issue we have already addressed. It does not impact our analysis here.

¶ 53        Because defendant cannot show that trial counsel's actions were objectively unreasonable, we find defendant received effective assistance.

¶ 54                            III. *Krankel* Hearing

¶ 55        Defendant claims that the trial court applied the wrong standard in determining whether to appoint new counsel at the *Krankel* hearing. Additionally, defendant submits that the trial court erred in failing to address his subsequent claims of ineffective assistance. Whether the trial

court properly conducted a *Krankel* hearing is a legal question that we review *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 56     In *Krankel*, our supreme court held that a defendant is entitled to new counsel during posttrial hearings if he demonstrates trial counsel's ineffective assistance. *Krankel*, 102 Ill. 2d 181. The trial court must conduct an adequate inquiry into the factual basis of the defendant's claim. *People v. Banks*, 237 Ill. 2d 154, 213 (2010). The trial court must examine defendant's *pro se* claims to determine whether they have merit or concern matters of purely trial strategy. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). "[I]f the defendant's allegations show possible neglect of the case, new counsel should be appointed to fully prosecute the ineffectiveness claim before the trial court." *People v. Jackson*, 2016 IL App (1st) 133741, ¶ 69. "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78.

¶ 57     Defendant contends that the trial court erred in moving directly to the *Strickland* test at the hearing without first establishing the factual basis of defendant's claims. The record shows the court did ask defendant about his motion and his reference to *Strickland*. When reading the complete transcript from this hearing, it is clear the court asked defendant questions regarding *Strickland* to elicit a response from defendant as to who wrote his motion. Once defendant explained to the court that he was not primarily responsible for his motion, the court engaged defendant in a series of questions about trial counsel's behavior and the specific basis for defendant's claim of ineffective assistance.

¶ 58     Defendant argues his claim is bolstered by the court's ruling that *counsel was not ineffective* and substitute counsel would not be appointed. Although the ruling references a *Strickland* inquiry, it also addresses the heart of a *Krankel* hearing: whether the court should appoint new counsel to represent the defendant in his posttrial motions. The trial court did not find that trial counsel neglected defendant's case. We find support for this ruling after reviewing the transcript of defendant's *Krankel* hearing.

¶ 59     Defendant's main claim, that trial counsel did not give him the option to proceed with a bench trial, was unsupported during the hearing. Trial counsel testified that he had a conversation with defendant about his options at trial and advised against a bench trial. A memo in trial counsel's case file documented conversations regarding a bench trial; defendant chose to proceed before a jury at both the first and second trial. Defendant never mentioned an issue with the jury despite being present at every step of the proceeding. The trial court did not find that trial counsel took the decision of whether to have a bench trial away from defendant. Based on the record, we find support for that ruling.

¶ 60     Finally, defendant argued he made subsequent claims of ineffective assistance, which the trial court ignored. At oral argument, the State conceded the trial court should have inquired into defendant's additional claims. Defendant attempted to raise additional claims of ineffective assistance at sentencing. The court denied defendant's motion to continue sentencing, emphasizing defendant already had a *Krankel* hearing. The court never inquired into the bases of defendant's additional claims.

¶ 61     This court recently addressed "whether the court [is] required, under *Krankel* and its progeny, to conduct another preliminary *Krankel* inquiry to address the subsequent claims defendant raised." *People v. Horman*, 2018 IL App (3d) 160423, ¶ 26. We held that public policy considerations require the court afford a defendant the opportunity to raise additional

claims of ineffective assistance. In order to properly address a defendant's claims, the trial court must conduct successive *Krankel* proceedings.

> "The preliminary *Krankel* inquiry is a way for the court to efficiently consider a defendant's allegations of ineffective assistance of counsel close in time to when they occurred and create a record that could be used on appeal. Such an inquiry is not burdensome on the court as it does not take much time." *Id.* ¶ 28.

This court went onto to hold that allowing only one *Krankel* inquiry would lead to absurd results, foreclosing a defendant from receiving the benefit of effective assistance at all stages in the proceeding. Remand is required here, where the court failed to make any inquiry into defendant's subsequent claims of ineffective assistance. *People v. Ayres*, 2017 IL 120071, ¶ 26.

¶ 62                                    IV. One-Act, One-Crime

¶ 63        Finally, defendant argues his convictions of home invasion and criminal sexual assault must merge. Defendant submits because his conviction of home invasion was predicated on criminal sexual assault, criminal sexual assault was a lesser-included offense that cannot stand on its own under the one-act, one-crime rule. Defendant raised this issue in a posttrial motion. Thus, it was properly preserved. The State urges this court to follow *People v. Fuller*, 2013 IL App (3d) 110391, as it is directly on point and controlling in this district.

¶ 64        Under the one-act, one-crime rule, a defendant may only be convicted and sentenced for the most serious offense if multiple charges arise out of the same act. *People v. King*, 66 Ill. 2d 551, 565 (1977). If a defendant committed multiple acts, the court must determine whether any of the offenses are completely encompassed by a greater offense. *Id.* If so, multiple convictions and sentences are improper. *Id.*

¶ 65        Defendant argues because criminal sexual assault was a predicate offense to the home invasion charge, he cannot be convicted and sentenced for both. This court has held otherwise. In *Fuller*, the defendant was also charged with home invasion predicated on criminal sexual assault. *Fuller*, 2013 IL App (3d) 110391, ¶ 16. This court, using the abstract elements test, determined that because it was possible to commit home invasion without committing criminal sexual assault, the convictions did not merge. *Id.* ¶ 18; see also *People v. Bouchee*, 2011 IL App (2d) 090542, ¶ 10. Defendant asks us to find *Fuller* was wrongly decided. We decline to do so. We reject defendant's one-act, one-crime argument.

¶ 66                                    CONCLUSION

¶ 67        For the foregoing reasons, the judgment of the circuit court of Will County is affirmed in part, reversed in part, and remanded.

¶ 68        Affirmed in part and reversed in part; cause remanded.